**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| BASHAR SHAIKH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-08-0204 |
| | § | |
| LIBERTY LIFE ASSURANCE | § | |
| COMPANY OF BOSTON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

In this ERISA action, Bashar Shaikh challenges the denial of long-term disability benefits under the plan provided by his employer, Golden West Financial Corporation. Shaikh argues that he was entitled to benefits under the long-term disability plan and that the plan administrator, Liberty Life Assurance Company of Boston, abused its discretion in denying his claim. The defendants have moved for summary judgment that as a matter of law the benefit denial was not an abuse of discretion. (Docket Entry Nos. 34, 35). Shaikh has responded and cross-moved for summary judgment that as a matter of law he is entitled to long-term disability benefits. (Docket Entry Nos. 37, 38). The defendants have responded to the cross-motion. (Docket Entry No. 39). Based on the motions and responses, the administrative record, and the applicable law, this court grants the defendants' motion for summary judgment and denies Shaikh's motion. Final judgment is entered by separate order.

The reasons for these rulings are set out below.

**I.      The Summary Judgment Record**

Beginning in February 1998, Bashar Shaikh worked in Houston as a Loan Representative II for World Savings Bank, a subsidiary of Golden West Financial Corporation.[1]  (Admin Rec. at 336).[2]  The job description stated that a loan representative "[p]romotes World's residential loan programs to consumers, realtors, and other appropriate prospects."  (*Id.* at 337).  The job duties included "giving sales presentations, making telephone contacts, and accepting borrower applications," with responsibility for managing "the loan process through funding."  (*Id.*).  The job qualifications and requirements included good presentation skills, good communication skills—both in person and over the phone—good attention to detail, ability to prioritize tasks and organize work effectively, ability to work flexible hours, and willingness to travel.  (*Id.*).

Shaikh's last day of work at World Savings was March 29, 2005.  (*Id.* at 336).  He states that on April 2, 2005, he was no longer able to work.  (Docket Entry No. 37 at 3).  On April 5, he submitted a request to World Savings for a medical leave of absence from March 30, 2005 through April 18, 2005.  On April 8, the Human Resources Department granted Shaikh's request, noting that it had received "a medical certification of a serious health condition" from Shaikh's doctor.  (Admin Rec. at 346).  On May 12, 2005, Shaikh went to see his primary care physician, Dr. Lynn Gibbs. He signed a note stating that Shaikh should be excused from work as of May 12 and "may return" to work on June 30, 2005.  The note listed diagnoses of hypertension, diabetes, sleep apnea, and thyroid abnormality.  The area marked "Limitations/Restrictions" was left blank.  (*Id.* at 357).

---

[1]   According to Golden West's 2005 10-K statement, Golden West was a holding company, the primary business of which was the operation of World Savings.  Golden West Financial Corp., Annual Report (Form 10-K), at 1.  Golden West was acquired by Wachovia Corporation in 2006.

[2]   The page numbers referred to in the Administrative Record are those that appear below "Liberty/Shaikh" in the bottom right corner of each page.

Shaikh was a participant in the Golden West Long Term Disability ("LTD") Plan.  (*Id.* at 338).  Liberty Life was both the provider and administrator of the LTD Plan.  The Plan provides benefits for employees who become "disabled."  There are two stages for determining disability.  Under the first, an employee is disabled if he "is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness."  (*Id.* at 6).  This stage applies up to 24 months of benefits.  After 24 months, an employee is disabled only if he "is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity."  (*Id.*).

On May 17, 2005, Shaikh faxed an LTD claim form to Liberty Life.  (*Id.* at 344).  The form stated that Shaikh last worked on April 1, 2005 and that he suffered from hypertension, diabetes, sleep apnea, and a thyroid problem.  (*Id.* at 345).  Shaikh also attached Dr. Gibbs's note from May 12.  On May 27, 2005, Liberty Life sent Shaikh a letter informing him that his benefits request been received.  The letter stated that there was a 90-day waiting period after the onset of disability before employees were eligible for LTD benefits.  Liberty Life asked Shaikh to complete a series of forms and return them so that an eligibility determination could be made.  (*Id.* at 343).

The forms included an "Activities Questionnaire."  Liberty Life received Shaikh's "Activities Questionnaire" on June 8.  In the form, Shaikh stated that he was able to sit for an hour at a time, stand for an hour at a time, walk for 30 minutes at a time, sit in a car for 2 to 3 hours, and drive a car for 2 to 3 hours before having to stop to walk and use the restroom.  He stated that he sat for 2 to 3 hours per day, stood for 2 to 3 hours per day, walked for 1 to 3 hours per day, took a 30 minute to 1 hour nap each day, and spent 8 to 10 hours each day in bed.  He stated that he was not able to wash his car but that he was able to work in his garden and on his house.  (*Id.* at 347).

3

Shaikh stated that he flies to Bangladesh every 2 or 3 years on vacation. He also stated that he experiences memory problems, specifically that he "cannot recall peoples' names, what [he] did one or two days ago" and where he has left his eyeglasses or car keys. (*Id.* at 348). In response to a question asking for a description of what prevented him from performing his own job, Shakih stated that his blood sugar levels would rapidly rise above 200 mg/dL, which required medication, or fall below 75 mg/dL, which caused disorientation and required him to eat. He also stated that he was fatigued during the day because of sleep apnea and frequent urination during the night, and that he experienced headaches and other physical pain. (*Id.* at 349). Shaikh also submitted a "Claimant Information Form." He listed his treating doctors in the last two years as Dr. Gibbs for primary care, Dr. Lorie M. Shapiro for endocrinology, and Dr. Akira Nishikawa for cardiology. (*Id.* at 341).

Only July 6, Liberty Life sent letters to these three doctors asking for their office notes, test results, and treatment records on Shaikh. Liberty Life also asked these doctors to complete a Functional Capacities Form. (*Id.* at 333-35). Dr. Gibbs completed the form on July 11, 2005 and returned it. Dr. Gibbs stated that he had last treated Shakih on June 21, 2005 and that Shakih visited monthly for hypertension, Type II diabetes mellitus, and sleep apnea. Dr. Gibbs reported that Shaikh could stand, drive, and reach without restriction, that he could walk "frequently," defined as 1/3 to 2/3 of the time, that he could sit, squat, bend, kneel, push, pull, and grasp "occasionally," defined as up to 1/3 of the time, and that he was unable to climb. Dr. Gibbs stated that Shaikh could make repetitive motions with his wrist, elbow, shoulder, and ankle up to 1/3 of the time and that he could lift 10 to 20 pounds occasionally. (*Id.* at 331). Dr. Gibbs stated that these restrictions were based on Shaikh's diagnoses and on his obesity and would be imposed "til further notice." (*Id.*).

Dr. Gibbs also sent Shaikh's medical records to Liberty Life. The records included notes from monthly office visits in 2005. On March 30, 2005, Dr. Gibbs noted that Shaikh had

4

complained of feeling faint from fluctuating blood sugar.  (*Id.* at 134).  On May 12, 2005, Dr. Gibbs

noted that Shaikh had begun using his BiPAP, a device to treat sleep apnea, but had not become

accustomed to it.  (*Id.* at 132).  On June 21, 2005, the notes reflect that Shaikh complained of fatigue

and shortness of breath.  (*Id.* at 131).  Dr. Gibbs also included a report from a sleep study performed

on Shaikh in July 2004.  The results were consistent with sleep apnea.  A CPAP titration study

planned for the second night of the study could not be completed because Shaikh did not sleep.  (*Id.*

at 315-24).  Dr. Gibbs also included the report from an April 22, 2005 Exercise Cardiolyte Stress

Test, which showed that Shaikh's heart performed within normal parameters but that he had a

"hypertensive response to exercise."  (*Id.* at 215).  According to Liberty Life's claim notes, Liberty

Life called Shaikh on July 19, 2005 to advise him that neither Dr. Nishikawa nor Dr. Shapiro had

submitted any records.  Shaikh stated that Dr. Gibbs was his primary doctor and that he had not seen

the other doctors in over a year.  (*Id.* at 361).

On July 19, 2005, Liberty Life sent Shaikh's medical information to a consulting physician

referral service, which assigned Dr. Mark Farber as the reviewer.  (*Id.* at 307-08).  On August 1,

2005, Dr. Farber sent Liberty Life a memorandum with his findings.  Dr. Farber found that "[n]o

level of impairment has been demonstrated in the medical records provided."  (*Id.* at 304).  He stated

as follows:

> There are no measures of pulmonary function to substantiate
> shortness of breath and no documented reason or condition which
> would preclude the claimant from performing the full time duties of
> at least a sedentary occupation.
>
> The claimant's conditions of diabetes, high blood pressure and
> obstructive sleep apnea are unlikely to progress and should stabilize
> with proper treatment.

5

(*Id.*).  Dr. Farber stated that Shaikh's sleep apnea required treatment.  He concluded that Shaik's diabetes was "reasonably well controlled," citing a Hemoglobin A1C (an indication of a three-month average blood sugar level) result of 6.5 from April 14, 2004, "just higher than the outside limits of normal of 6."  (*Id.* at 305).

On August 8, 2005, Liberty Life mailed Shaikh a letter denying his claim for LTD benefits. (*Id.* at 300-02).  The letter stated that Liberty Life had "completed a thorough review of your eligibility for disability benefits, and [had] determined that benefits are not payable."  (*Id.* at 300). After explaining the information that Liberty Life relied on in deciding that no benefits were due, the letter stated as follows:

> Although you may continue to experience some symptoms, we are unable to determine the severity of your condition based on the medical information in your file, the medical information contained in your file does not support complications severe enough to prevent you from performing the material and substantial duties of your own occupation as a Loan Representative.  Your occupation is described as a sedentary occupation.  Therefore, you do not meet your Policy's definition of disability, and we must deny your claim for benefits.

(*Id.* at 301).  Liberty Life informed Shaikh that he had a right to submit a written request for review of the denial within 180 days.  (*Id.*).

On October 24, 2005, Shaikh's attorney faxed a letter to Liberty Life requesting the claim file, the LTD policy, the plan summary, and other documents.  (*Id.* at 204-05).  Liberty Life responded on October 26, 2005 by sending the claim file and LTD policy, which it stated was the "complete administrative record and comprises all information that was received, reviewed and considered." (*Id.* at 291).  Shaikh's next contact with Liberty Life was a January 20, 2006 fax from his attorney requesting a 60-day extension of the February 4, 2006 appeal deadline.  (*Id.* at 290). Counsel for Shaikh reurged the request on February 2.  (*Id.* at 288).  The next day, Liberty Life

granted Shaikh a 30-day extension, stating that "any additional information you wish to be considered" had to be submitted by March 3, 2006.  (*Id.* at 287).  On February 14, 2006, Shaikh's counsel wrote a letter asking for copies of Dr. Farber's report and curriculum vitae, a list of documents reviewed, and a job description for each sedentary job Liberty Life believed Shaikh could perform.  (*Id.* at 262).  On February 20, 2006, Liberty Life responded by sending another copy of the claim file, Dr. Farber's curriculum vitae, and a copy of the Dictionary of Occupational Titles ("DOT") occupational description for a Loan Officer.  (*Id.* at 260).  According to the DOT, the position of Loan Officer is sedentary and involves mostly sitting, but may involve standing or walking for short periods.  The position requires lifting, carrying, pushing, or pulling 10 pounds occasionally.  The position also requires reaching and handling frequently, fingering occasionally, and talking and hearing constantly.  (*Id.* at 257).

On February 28, 2006, Shaikh's attorney sent Liberty Life an appeal letter with additional documents. The letter stated that the initial administrative record provided "no rational basis for denying Mr. Shaikh's claim for benefits" and that the additional documents made it even clearer that there was no basis for denial.  (*Id.* at 186-91).  The additional documents submitted included more recent office notes from Dr. Gibbs.  On July 25, 2005, Dr. Gibbs wrote that Shakih had complained of fatigue, shortness of breath, knee and back pain, excessive urination, and urination during the night.  (*Id.* at 130).  On August 22, Dr. Gibbs's notes show that Shaikh had gone to the hospital the previous Sunday and been diagnosed with Bell's palsy, a facial paralysis.  (*Id.* at 129).  September 29, 2005 and December 19, 2005 office notes showed that the Bell's palsy had continued and that Shaikh had elevated lipid levels in his blood and fluctuating blood sugar.  (*Id.* at 127-28).  The appeal letter also attached printouts from the Internet providing information about Bell's palsy and diabetes, Dr. Gibbs's curriculum vitae, and medical records and a curriculum vitae from Dr. Shapiro.

7

Shaikh also included a statement describing his symptoms.  He stated that because of his Bell's palsy, he could not look at a TV or computer screen for more than 30 or 40 minutes before his right eye started watering, could not brush his teeth without splashing water, and occasionally had a "tingling feeling" near his jaw.  He also stated that he would get a headache if he read "for too long," became "tired very frequently" if he walked, could not sleep because of his sleep apnea, had to use the restroom during the night, felt  "disoriented" if his blood sugar was too high or low, and was "unable to drive a car by [him]self" because of his blood sugar fluctuation.  (*Id* at 159-60).

Liberty Life referred the expanded file to Behavioral Medical Interventions ("BMI") on March 7, 2006 for review and consultation.  BMI assigned the referral to Dr. Mark Johnson, a board-certified internist.  (*Id.* at 107).  Dr. Johnson performed a file review, which included a telephone conversation with Dr. Gibbs.  After the phone call, Dr. Johnson sent Dr. Gibbs a summary of the conversation.  In the summary, Dr. Johnson wrote:

> You indicated you felt Mr. Shaikh was physically able to do a sedentary job.  Although Mr. Saikh has Diabetes Mellitus, he is not complaint with its treatment and has Diabetic Neuropathy.  He is also receiving treatment for Hyperlipidemia and has Degenerative Joint Disease in both knees.  He is morbidly obese, although he regularly tells you he eats very little.  He has had recent Bell's palsy, but this has not caused any functional loss.  You also indicated he has severe Sleep Apnea, but won't use the CPAP machine.  We discussed that Mr. Shaikh could be in better health if he was more compliant with the treatment plan, but even in his current clinical state, you feel he is not impaired to such a degree that he is unable to perform a sedentary job.

(*Id.* at 102).  Dr. Gibbs signed the summary to indicate that it was accurate and faxed it back to Dr. Johnson. (*Id.*).

Dr. Johnson completed a report dated March 14, 2006 and submitted it to Liberty Life.  The report concluded that "despite his multiple medical conditions, none of them in the aggregate rise

to such a level of severity that the claimant is functionally impaired to the extent that he cannot perform his sedentary job duties as a Loan Officer." (*Id.* at 104). Dr. Johnson explained that "Bell's palsy is a spontaneous weakness of the facial nerve which does not cause any significant physical impairment and, although there is no specific treatment, the condition fortunately spontaneously clears in the majority of cases." (*Id.* at 103). He noted that the palsy was not a source of work impairment. Dr. Johnson stated that Shaikh's diabetes was "under fairly good control" and did not prevent him from performing his job duties as of the date he stopped working, April 2, 2005. (*Id.* at 104). The doctor also stated that Shaikh's hypertension would not have prevented him from performing his job as of April 2, 2005 and that the April 22, 2005 stress test results showed no cardiovascular condition that would have caused an impairment. (*Id* at 105). Dr. Johnson concluded that Shaikh's "subjective complaints of shortness of breath are not supported by objective medical findings. There is no indication he has any cardiopulmonary disease, or other medical condition, to explain these complaints. He may have shortness of breath related to physical de-conditioning and his severe overweight condition, but these symptoms would not rise to such a level of severity as to preclude him from sedentary duties." (*Id.*).

On March 20, 2006, Liberty Life sent a letter to Shaikh's attorney stating that, based on the entire claim file, including the newly submitted information, "the denial of benefits must be maintained." (*Id.* at 89). The letter stated: "While we recognize that Mr. Shaikh continues to complain of pain, the totality of medical and vocational documentation reviewed does not substantiate that Mr. Shaikh is disabled from performing his own occupation within his vocational capacity." (*Id.*). After describing the materials reviewed and Dr. Johnson's conclusions and acknowledging Shaikh's "subjective complaints of physical impairment," the letter reiterated that "the medical and clinical evidence on file does not establish that his current clinical state is of a

nature and severity which would preclude him from performing the material and substantial duties of his own occupation." (*Id.* at 92). Liberty Life informed Shaikh that his "administrative right to review has been exhausted and no further review will be conducted by Liberty and your claim will remain closed." (*Id.* at 93). He was also informed of his rights to obtain the claim file free of charge and file a civil action. (*Id.*).

On September 29, 2006, Shaikh's attorney wrote a letter to Liberty Life requesting portions of the administrative record. (Docket Entry No. 34-10 at 27). Liberty Life responded on October 9, 2006. (*Id.* at 25). Over a year after the appeal was denied, on April 27, 2007, counsel for Shaikh sent a letter to Liberty Life stating that he had shown Dr. Gibbs parts of the administrative record, Liberty Life's decision, and Shaikh's World Savings job description. (*Id.* at 14). Attached to the letter was a letter from Shaikh's attorney to Dr. Gibbs, which included the following:

> Finally, this confirms your understanding the performance of these duties and responsibilities by Mr. Shaikh required a substantial amount of travel. You have previously advised that Mr. Shaikh would not be able to travel at all in his job because of his health condition.
> . . .
>
> You have advised us that the February 28[, 2006] conversation with Dr. Johnson was based upon a short generic and general job description of a loan representative in which he asked if Mr. Shaikh could perform the general duties involved. . . . . The February 28th conversation did not involve any discussion of the material and substantial duties of Mr. Shaikh's job with World Savings, nor any discussion of the substantial amount of travel required of Mr. Shaikh.
> . . .
>
> In light of Liberty Mutual's definition of "disability" or "disabled" and the more detailed outline of Mr. Shaikh's job duties and responsibilities, please confirm to us, by your signature below, your professional opinion that Mr. Shaikh could not perform all of the material and substantial duties of his occupation on a full time basis at least since March of 2005.

(*Id.* at 16).  Dr. Gibbs signed the letter.  (*Id.* at 17).  In addition to Dr. Gibbs's letter, Shaikh also attached auto-mileage reimbursement reports showing that he had driven between 800 and 1000 business miles per month throughout 2004.  (*Id.* at 19-24).

On September 4, 2007, Shaikh's counsel sent another letter to Liberty Life.  (*Id.* at 9).  This letter included a May 9, 2007 report about neuropathy in Shaikh's wrist.  (*Id.* at 10).  Liberty Life responded on October 22, 2007, stating that it was unable to consider the additional material because Shaikh had exhausted his right to appeal under ERISA.  Liberty Life stated that the benefits denial would stand and the claim file would remain closed.  (*Id.* at 11-12).

Shaikh sued Liberty Life and Golden West on January 17, 2008, asserting that he is entitled to LTD benefits under ERISA, 29 U.S.C. § 1132.  (Docket Entry No. 1).  On August 22, 2008, this court dismissed Shaikh's claims for breach of fiduciary duty and equitable relief based on ERISA preemption.  (Docket Entry No. 13).  The parties have now cross-moved for summary judgment on the ERISA benefits claim.  (Docket Entry Nos. 34-39).  The defendants argue that a deferential standard of review is appropriate but that even under a more stringent standard, Liberty Life's denial did not violate ERISA.  They also assert that the documents submitted after the appeal was denied should not be considered but that including them in the analysis does not change the outcome. (Docket Entry No. 34).  Shaikh argues that the conflict of interest in Liberty Life's roles as insurer and administrator requires a less deferential standard of review and that the benefits denial cannot stand, particularly in light of the later-submitted evidence.  (Docket Entry No. 37).  These arguments and responses are considered below.

## II.    The Applicable Law

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v.  Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, 106 S. Ct. 2548 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325, 106 S. Ct. 2548. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir.  2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir.  2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d

12

at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

The moving party bears a heavier burden when seeking summary judgment on a claim or defense on which it would bear the burden of proof at trial.  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Id.* (emphasis in original);  *see also Meecorp Capital Markets LLC v. Tex-Wave Industries LP*, 265 F.App'x 155, 157 (5th Cir. 2008) (per curiam) (unpublished) (quoting *Fontenot*, 790 F.2d at 1194).

## B.    ERISA

ERISA requires a district court to review determinations made by employee benefits plans, including employee disability plans.  *See* 29 U.S.C. § 1132(a)(1)(B); *Baker v. Metro. Life Ins. Co.*, 364 F.3d 624, 629 (5th Cir. 2004).  If a plan document expressly confers on the plan administrator the authority to determine benefits and construe the plan terms, that is sufficient to invoke an abuse-of-discretion standard of review.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948 (1989).  In some circuits, unless this *Firestone* language is in the plan documents, the more demanding *de novo* standard of review is applied to the plan administrator's decision, whether it interprets plan terms or makes factual determinations.  *See, e.g.*, *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249-250 (2d Cir. 1999); *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1182-84 (3d Cir. 1991); *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993); *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 379 n.2 (7th Cir. 1994).  In the Fifth Circuit, however, even if the plan does not expressly give the decisionmaker discretionary authority, "for factual determinations under ERISA plans, the abuse

13

of discretion standard of review is the appropriate standard." *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991); *see also Vercher v. Alexander & Alexander,* 379 F.3d 222, 226 (5th Cir. 2004); *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 597-98 (5th Cir. 1994); *Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 100-01 (5th Cir. 1993).

"A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, 246 (5th Cir. 2009) (internal quotation marks and citations omitted). "'If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary or capricious, it must prevail.'" *Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465, 468 (5th Cir. 2010) (quoting *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004)). The plan administrator's decision is arbitrary "'only if made without a rational connection between the known facts and the decision or between the found facts and the evidence.'" *Holland*, 756 F.3d at 246-47 (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999)). Under the abuse of discretion standard, a court's "'review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness–even if on the low end.'" *Holland*, 576 F.3d at 247 (quoting *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007)). As explained below, this standard of review may vary if the plan administrator has a conflict of interest.

## III. Analysis

### A. The Appropriate Standard of Review

The plan documents give Liberty Life discretionary authority to make eligibility determinations and interpret the plan terms. At the same time, because Liberty Life was both the insurer and the plan administrator, it had a structural conflict of interest. Shaikh asserts that an

additional conflict of interest was created by the financial relationship between Liberty Life and the third-party medical reviewers.   Liberty Life asserts that the effect of these relationships on the standard of review is uncertain.   The parties dispute how much less deferential than usual this court's review should be.

In *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343, 2349-50 (2008) (internal quotation marks and citation omitted), the Supreme Court concluded that a structural conflict resulting from an insurer also serving as plan administrator "should be taken into account on judicial review of a discretionary benefit determination," including when the insurer/administrator is a professional insurance company rather than a self-insured employer.   The Court held that such "a conflict should 'be weighed as a factor in determining whether there is an abuse of discretion.'" *Id.* at 2350 (quoting *Firestone*, 489 U.S. at 115, 109 S. Ct. 948 (internal quotations omitted)).   Such a structural conflict does not change the standard of review "from deferential to *de novo* review," but requires "the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." *Id.* at 2350.   "[C]onflicts are but one factor among many that a reviewing judge must take into account." *Id.* at 2351.   The Court also stated that the relative weight given to a conflict of interest should vary from case to case.   In applying the multifactor test, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id.*   As the Court explained:

> The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.   It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote

> accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* at 2351 (internal citations omitted).

Fifth Circuit cases applying *Glenn* provide useful guidance.  In *Holland*, 576 F.3d at 248 n.3, the court held that *Glenn* "directly repudiated the application of any form of heightened standard of review to claims denials in which a conflict of interest is present."  The court stated that *Glenn* overruled earlier Fifth Circuit cases applying a "sliding scale" under which the greater the evidence of conflict, the less deference was given.  *Id.*  Under the "sliding scale" approach, the Fifth Circuit had given "only a *modicum less* deference" when there was a "minimal basis for a conflict."  *Id.* (quoting *Lain v. UNUM Life Ins. Co.*, 279 F.3d 337, 343 (5th Cir. 2002) (emphasis original, quotation marks removed by *Holland* court)).  But the *Holland* court concluded that "much of our 'sliding scale' precedent is compatible with the Supreme Court's newly clarified 'factor' methodology, and *Glenn* does not supercede that precedent to the extent that it reflects the use of a conflict as a factor that would alter the relative weight of other factors."  *Id.*

Reviewing the facts in *Holland*, the court held that to the extent a conflict of interest was present, it "is not a significant factor in this case."  *Id* at 249.  *Holland* involved a trust set up by International Paper to provide its employees disability benefits.  The company funded the trust and a senior corporate officer served as the plan administrator.  Citing *Glenn*, the court held that a structural conflict of interest was present because "the employer who funds the plan also determines eligibility for benefits."  *Id.* at 248.  But the conflict was minimized because International Paper's trust contributions were irrevocable and non-reversionary and the trust assets were not the company's assets.  In other words, "a decision to pay benefits does not directly affect International

16

Paper's bottom-line." *Id.* at 249.  The plan had also set up a structural protection against the conflict of interest by sending all claims to "independent medical professionals who have affirmed that they have no conflict of interest and that their compensation" did not depend on the outcome of their review.  *Id.*  Finally, the court noted that there was no evidence that the conflict of interest had affected the benefits decision at issue or that there was a history of abuses of discretion.  *Id.*

More recently, in *Schexnayder*, 600 F.3d at 470-71, the court applied *Glenn* and found that the structural conflict of interest present in that case was "a more significant factor."  Hartford served as both the plan administrator and the insurer; the court noted that "a decision to pay benefits affects Hartford's bottom-line, because benefits payments come directly from Hartford."  *Id.* at 470. Following *Glenn's* directive to consider surrounding circumstances, the court noted that Hartford had not taken "any precautions to avoid or minimize this conflict," such as creating a wall between claims administrators and others or by setting up a system to penalize inaccurate benefits decisions. *Id.*  The record on the benefits denial at issue showed that Hartford had ignored the Social Security Administration's determination that the claimant was "fully disabled and unable to perform any work."  *Id.* at 471.  These circumstances "suggest[ed] procedural unreasonableness," leading the court to "believe that Hartford's financial bias may have played a part in its decision."  *Id.* at 470-71.  The conflict of interest factor was accordingly given greater relative weight in the analysis.  The fact that Hartford had overlooked the Social Security award was as an independent factor undercutting Hartford's decision.  *Id.* at 471.  "Although substantial evidence supported Hartford's decision, the method by which it made the decision was unreasonable, and the conflict, because it [was] more important under the circumstances, act[ed] as a tiebreaker for [the court] to conclude that Hartford abused its discretion."  *Id.* at 471.

17

In the present case, there is no evidence in the record suggesting similar "procedural unreasonableness." Liberty Life did not ignore or overlook contrary evidence similar to the Social Security decision ignored in *Schexnayder*. *Cf. id.* at 470-71. Nor is there any evidence that Liberty Life has a history of abusing its discretion or that the structural conflict actually affected its decision to deny benefits to Shaikh in this case. *Cf. Holland*, 576 F.3d at 249. And, as in *Holland*, Liberty Life sent Shaikh's medical records to independent, third-party reviewers to make recommendations. *See id.* Liberty Life did so once when Shaikh made his original claim and again, with a different doctor who was a board-certified internist, when Shaikh appealed the denial of benefits and provided updated records. Both doctors agreed that Shaikh could perform his own sedentary occupation. Dr. Johnson's review, during the appeal, included a consultation with Shaikh's primary care physician, Dr. Gibbs, who supported Dr. Johnson's assessment. Nothing in the record supports Shaikh's argument that this court's review should be more stringent because of the third-party medical reviewers' potential bias. There is no evidence that the reviewing doctors obtain a significant amount of income or business from Liberty Life or that their compensation is in any way tied to the results they reach in reviewing claimants' records. The record shows that the structural conflict of interest should not be given relatively more weight in the abuse of discretion analysis.

The record does not include evidence of some of the steps cited with approval in *Glenn, Holland,* and *Schexnayder*. There is no evidence, for example, as to whether Liberty Life walled off its claims representatives from those with a financial interest in the company or implemented a review system to penalize improper claim decisions. Although there was not an irrevocable, nonreversionary trust holding the assets used to pay Golden West employee LTD benefits, that is to be expected because Liberty Life is a professional insurance company, not a self-insuring employer. The absence of these structural protections does not substantially affect the significance

of the conflict of interest as a factor in the analysis.  Given all the evidence, a level of deference similar to that accorded the plan administrator's decision in *Holland* is appropriate.

### B.    Liberty Life's Denial of Benefits

Under such a level of review, or even a more stringent examination, it is clear that Liberty Life did not abuse its discretion in denying Shaikh's claim for LTD benefits.  Liberty Life's decision was not arbitrary and was supported by substantial evidence.  *See Schexnayder*, 600 F.3d at 468; *Holland*, 576 F.3d at 246-47.

The administrative record contained the opinions of three doctors that Shaikh could perform his own sedentary job.  Dr. Farber, the first doctor Liberty Life consulted, stated that "[n]o level of impairment has been demonstrated in the medical records provided."  (Admin Rec. at 304).  He stated that Shaikh's medical conditions were reasonably well controlled and could be addressed by appropriate treatment.  Dr. Johnson, the second doctor consulted for review, concluded that none of Shaikh's conditions, either individually or in the aggregate, rose to "such a level of severity that the claimant is functionally impaired to the extent that he cannot perform his sedentary job duties as a Loan Officer." (*Id.* at 104). This included the Bell's palsy, which had developed since the initial denial of benefits.  Dr. Johnson stated that the palsy was not a source of work impairment.  He wrote that Shaikh's "subjective complaints of shortness of breath are not supported by objective medical findings" of a "cardiopulmonary disease, or other medical condition."  (*Id.* at 105).  Dr. Gibbs, Shaikh's treating physician, had signed a letter affirming that "Mr. Shaikh could be in better health if he was more compliant with the treatment plan, but even in his current clinical state, [] he is not impaired to such a degree that he is unable to perform a sedentary job." (*Id.* at 102).  Shaikh's laboratory test results were consistent with the doctors' conclusions.

Shaikh's own statements about his condition were also consistent with the doctors' conclusions. Shaikh stated in his survey that he could work in the yard and on his house. He stated that he could sit for an hour at a time, stand for an hour at a time, walk for 30 minutes at a time, and drive a car for two to three hours before stopping. The reports provided by Shaikh's treating physician, Dr. Gibbs, were also consistent with a no-disability finding. Dr. Gibbs reported that Shaikh could stand, drive, and reach without restriction; that he could walk "frequently," meaning 1/3 to 2/3 of the time; that he could sit, squat, bend, kneel, push, pull, and grasp "occasionally," meaning up to 1/3 of the time; and that he was unable to climb. Dr. Gibbs stated that Shaikh could make repetitive motions with his wrist, elbow, shoulder, and ankle up to 1/3 of the time and that he could lift 10 to 20 pounds occasionally. This evidence provides ample basis for Liberty Life's conclusion that Shaikh could perform his own job. The DOT job description states that Loan Officer is a sedentary position that requires sitting, standing, or walking for short periods, lifting, carrying, pushing, or pulling 10 pounds occasionally, reaching and handling frequently, fingering occasionally, and talking and hearing constantly. (*Id.* at 283). The evidence in the administrative record when Liberty Life denied the claim and the appeal supported a conclusion that Shaikh was capable of all these tasks.

Shaikh argues that his limited ability to sit and to travel made him disabled from his occupation. But the record shows that Shaikh was able to sit for at least an hour at a time and Shaikh himself stated that he could drive his car for two to three hours continuously before he had to stop to stretch his legs and use the restroom. The administrative record supported the conclusion that, provided Shaikh could take restroom breaks, stand up occasionally, check his blood sugar, and eat snacks or take medication when appropriate, he could perform the duties of his own job. *See Vercher*, 379 F.3d at 231 ("However, so long as [the plaintiff] was able to perform all the substantial

20

and important aspects of her job, with reasonable accommodation, and any aspects of the job that she could not perform with reasonable accommodation were, singularly or together, *not* indispensable or essential to the job, then she was not disabled." (emphasis in original)).  Nothing in the record suggests that Shaikh's own job precluded him from taking these actions.

Shaikh also argues that Liberty Life ignored evidence that he had memory problems.  This issue was not addressed in the original denial letter or the letter affirming the denial after appeal. But the evidence of memory impairment in the record was minimal.  The only evidence was Shaikh's statement in his questionnaire that he "cannot recall peoples' names, what [he] did one or two days ago" and where he has left his eyeglasses or car keys.  (*Id.* at 348).  These issues were not mentioned at all in Shaikh's medical records or Dr. Gibbs's office notes.  Neither medical reviewer found them sufficiently relevant or important to mention in his report.  Similarly, Shaikh argues that Liberty Life overlooked the impairing effects of the Bell's palsy he developed between the initial denial and the appeal.  Contrary to Shaikh's argument, Liberty Life specifically addressed this condition in the letter denying Shaikh's appeal.  Liberty Life quoted Dr. Johnson's finding that the Bell's palsy was not "shown to be impairing," and cited Dr. Gibbs's statement that the Bell's palsy had "not caused functional loss."  (*Id*. at 90, 92).

Finally, Shaikh argues that Liberty Life improperly "attempted to graft on an extra requirement to the policy" by requiring objective evidence to support Shaikh's claims.  (Docket Entry No. 37 at 9-10).  The Fifth Circuit has approved a plan administrator's looking to a lack of objective evidence in denying benefits for a disability claim based on subjective symptoms.  In *Vercher*, 379 F.3d at 231-32, the consulting physician hired by the plan administrator reviewed the claim file of a plaintiff who had been in a car accident and found "no objective evidence of a neuromuscular or psychiatric impairment which prevents employment."  The doctor found that the

21

plaintiff's poor results on functional assessments indicated a lack of effort and that her "[i]ntolerance for prolonged sitting" and other reported physical difficulties could not be attributed to her postaccident surgery.  Even though the plaintiff had been diagnosed with depression after the accident and her physician recommended medical retirement, the Fifth Circuit held that the plan administrator's decision to deny benefits was supported by the record.  *Id.* at 232.

Shaikh's argument is also undercut by another recent Fifth Circuit case.  In *Corry,* 499 F.3d at 399-400, the district court held that Liberty Life, the plan administrator, had abused its discretion by focusing only on objective criteria in rejecting a claim for disability benefits based on a diagnosis of fibromyalgia, a condition characterized by subjective symptoms.  The Fifth Circuit reversed. Reviewing Liberty Life's decision with "a modicum less deference" because of a structural conflict, the Fifth Circuit held that there was no abuse of discretion.  *Id.* at 399.  Although there was insufficient evidence that the consulting physicians had considered the plaintiff's self-reported symptoms, the record showed that Liberty Life had taken them into account because the subjective complaints were specifically mentioned in the letter denying benefits.  *Id.* at 399-400.

In the present case, the record also shows that Liberty Life reviewed the subjective evidence in making its decision.  Dr. Johnson's report states that Shaikh complained of shortness of breath and referred to Gibbs's office notes, which contained records of Shaikh's subjective complaints. (Admin Rec. at 97-100).  Dr. Farber's report also cited Shaikh's complaints of shortness of breath. (*Id.* at 304).  The initial letter denying the claim cited Dr. Farber's conclusion about the shortness of breath, acknowledged that Shaikh "may continue to experience some symptoms," and noted Dr. Gibbs's office notes and questionnaire about Shaikh's functional abilities.  (*Id.* at 300-02).  The letter denying the appeal stated that Liberty Life "recognize[s] that Mr. Shakih continues to complain of pain," noted the shortness of breath, noted knee problems, referred to "subjective

complaints of physical impairment, and stated that "we understand Mr. Shaikh may experience symptoms." (*Id.* at 89-93).  As in *Corry*, the record shows that Liberty Life gave sufficient consideration to the subjective symptoms in analyzing the disability claim.

Many of the subjective symptoms Shaikh described in the statement he submitted with his February 2006 appeal were contradicted by other evidence in the record.  Shaikh stated that he could not drive a car; Dr. Gibbs stated that Shaikh could drive without restriction and Shaikh stated himself in filling out his questionnaire that he could drive continuously for two to three hours before stopping.  There was no medical evidence showing that Shaikh's condition had so deteriorated in the months between the initial claim and the appeal that he could not drive at all.  The only significant medical change shown in the record was that Shaikh developed Bell's palsy.  But Dr. Gibbs told Dr. Johnson that Bell's palsy did not cause any work impairment and Dr. Gibbs recommended no treatment, recognizing that the condition usually resolves on its own.

Taken as a whole, the administrative record shows that Liberty Life's decision to deny benefits was supported by a sufficient factual record.  This conclusion was not so divorced from the facts in the record that it was arbitrary or capricious to deny Shaikh benefits. The decision to deny benefits was not an abuse of discretion.

### C.    Evidence Submitted After Appeal

Shaikh submitted additional evidence to Liberty Life after his appeal was denied.  Liberty Life argues that this additional evidence, filed 13 and 17 months after the appeal was denied, should not be considered because it was not part of the administrative record.

The Fifth Circuit has held that evidence becomes part of the administrative record if it is "made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it."  *Vega v. National Life Ins. Services*,

188 F.3d 287, 300 (5th Cir. 1999) (en banc), *abrogated on other grounds by Glenn*, 554 U.S. 105, 128 S. Ct. at 2347-52.  "If the claimant submits additional information to the administrator, and requests the administrator to reconsider its decision, that additional information should be treated as part of the administrative record." *Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 215 F.3d at 521 n.5 (5th Cir. 2000) (citing *Vega*, 188 F.3d at 300).

A later panel of the Fifth Circuit explained the uncertainty created by the *Vega* opinion. *See Keele v. JP Morgan Chase Long Term Disability Plan*, 221 F.App'x 316, 319-20 (5th Cir. 2007) (unpublished).  In *Keele*, the court noted that to the extent *Vega* allowed the administrative record to be supplemented after the final administrative decision was reached, it was inconsistent with prior circuit authority.  *Id.* at 320 (citing *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 102 (5th Cir. 1993); *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 827 (5th Cir. 1996)).  Citing a district court opinion, the court observed that such an interpretation of *Vega* would also cause practical problems for both plan administrators and reviewing courts.  *Id.* (citing *Needham v. Tenet Select Benefit Plan*, No. Civ.A. 02-3291, 2004 WL 193131, at *7 (E.D. La. Jan. 30 2004)).  Such an approach would mean that a plan administrator might abuse its discretion by failing to reconsider its decision each time a new document was submitted and a request for review was made and that an administrator might not ever be able to close its claim file.  Such an approach would also mean that a court would not know whether it could, consistent with abuse of discretion review, consider later filed evidence that the plan administrator had not been able to consider.  *Id.*; *see also Majeski v. Metropolitan Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir. 2009) (citing *Keele* and observing that "*Vega* is an outlier whose reasoning does not stand on firm ground.").

In *Keele*, the court observed that the Fifth Circuit had not interpreted what it meant for a claimant to submit information "in a manner that gives the administrator a fair opportunity to

consider it." 221 F.App'x at 320. At least one district court opinion provided support for interpreting that language to mean that "evidence submitted two years after a claim was denied" was not part of the administrative record. *Id.* (citing *Schaffer v. Benefit Plan of Exxon Corp.*, 151 F.Supp.2d 799, 809 (S.D. Tex. 2001)). On the other hand, an interpretation focusing on the time between submitting the information and filing the lawsuit, rather than between the administrative decision and the submission, was more consistent with *Vega's* goal of encouraging administrative resolution of claim disputes. *Id.* Ultimately, the *Keele* court stated that it "need not decide this question of *Vega's* precise requirements today, because we conclude that the documents in dispute do not change the disposition of the case." *Id.* Other courts have followed *Keele* in finding that the later submitted information did not change the outcome. *See, e.g., Patterson v. Prudential Ins. Co. of Am.*, 693 F.Supp.2d 642, at 655 n.91 (S.D. Tex. 2010); *Keller v. AT&T Disability Income Plan*, 664 F.Supp.2d 689, 702-03 (W.D. Tex. 2009).

Like *Keele* and the courts following it, this court need not resolve the question of how to interpret the operative language in *Vega*. Considering the materials Shaikh submitted after the final administrative decision does not lead to a different conclusion on the merits. On April 27, 2007, over a year after the appeal was denied, Shaikh sent a letter to Liberty Life reporting Dr. Gibbs's conclusion that "Mr. Shaikh would not be able to travel at all in his job because of his health condition" and that "Mr. Shaikh could not perform all of the material and substantial duties of his occupation on a full time basis at least since March of 2005." (Docket Entry No. 34-10 at 16). Several months later, on September 4, 2007, counsel for Shaikh sent Liberty Life a May 9, 2007 report concerning neuropathy in Shaikh's wrist. (*Id.* at 9-10).

Shaikh's primary contention is that the supposed travel restriction revealed after the administrative appeal made him unable to perform his job. Dr. Gibbs's statement that Shaikh could

25

not perform his job duties as of March 2005 is inconsistent with the administrative record, most notably Dr. Gibbs's own earlier statements that Shaikh could perform his job duties. The only specific factor that appears to explain Dr. Gibbs's change in position was the statement about Shaikh's inability to travel. No other factor is identified. In July 2005, however, Dr. Gibbs stated that Shaikh could drive without restriction. In June 2005, Shaikh himself stated that he could drive up to three hours continuously, limited only by his need to stretch his legs and use the restroom. There is no evidence that Shaikh's job required any travel other than car travel. The record does not support any conclusion that as of June or July 2005, Shaikh could not travel by car or that he could not perform any travel required by his job duties because of travel restrictions.

To the extent the travel restriction Dr. Gibbs reported was based on a deterioration of Shaikh's condition after he stopped working at World Savings, it is irrelevant. Liberty Life interprets the Plan as providing coverage only to those who are "Disabled" as of the date their employment ends. (Docket Entry No. 35, Ex. A, Aff. of Heather Heins, ¶ 13).[3] Taking into account the lesser degree of deference appropriate because of the structural conflict, *see Holland*, 756 F.3d at 246-47, this interpretation is supported by the plain meaning of the Plan terms. A person is only "Disabled" if he is a "Covered Person" unable to perform his job duties "during the [90-day] Elimination Period and the next 24 months of Disability." (Admin Rec. at 6). The Plan defines "Covered Person" as "an Employee insured under this policy." (*Id.* at 5). "'Employee' means a person in Active Employment with [Golden West]." (*Id.* at 6). Under the Plan, "[a] covered person will cease to be insured on . . . the date employment terminates. Cessation of active employment

---

[3]   Shaikh has objected to four parts of Heins's affidavit, including a different portion of paragraph 13 than the one relied upon here. Because this court does not rely on any of the objected-to statements in the affidavit, the objections are moot.

will be deemed termination of employment, except the insurance will be continued for an Employee absent due to Disability." (*Id.* at 23). Shaikh stopped working at World Savings in March 2005. Liberty Life found that he was not "Disabled" as of that date. The record supports that finding. Because Shaikh was not disabled when he stopped working at World Savings and he did not return to work, he was no longer a "Covered Person" and was not eligible for LTD coverage based on later impairments. Evidence showing that Shaikh was unable to drive in 2007, when there is undisputed evidence he was capable of doing so several months after leaving work in 2005, does not affect the analysis of his eligibility for benefits.

In summary, the decision to deny benefits was supported by the record before the Plan administrator and by the relevant parts of the record submitted after the decision. No abuse of discretion is shown.

## IV.    Conclusion

The defendants' motion for summary judgment is granted and Shaikh's motion is denied. Final judgment is entered by separate order.

SIGNED on July 6, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

27